**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SYNEXIS, LLC,[1]<br><br>Debtor. | Chapter 11<br>(Subchapter V)<br><br>Case No. 26-11846 (___) |

**DECLARATION OF CLAUDIA Z. SPRINGER IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION INTEREST HOLDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Claudia Z. Springer, pursuant to section 1746 of title 28 of the United States Code, declare under penalty of perjury as follows:

**Qualifications**

1. My name is Claudia Z. Springer, and I am a principal of Novo Advisors, LLC ("**Novo**"), a financial advisory firm providing performance improvement, liquidity management, turnaround, and restructuring services. I have more than forty-five years of corporate restructuring experience. I am duly authorized to make this declaration (this "**Declaration**") in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Interest Holders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Motion**").

[1] The Debtor's federal tax identification number is: 26-2382127. The mailing address for the Debtor is 8905 Lenexa Drive, Overland Park, Kansas 66214.

2. Prior to joining Novo, I practiced bankruptcy and restructuring law for more than 40 years, including nearly 20 years as a partner at Reed Smith LLP. During my legal career, I represented major constituents in restructuring and bankruptcy cases, including debtors, major creditors, shareholders, boards of directors, creditors' committees, landlords, asset purchasers, plan sponsors, bondholders, and guarantors. My practice also included litigation and mediation of disputes concerning creditors' remedies, contract breaches, lender liability, lease terminations, product liability, and labor and employment matters.

3. During my practice of law at Reed Smith, I was inducted into the American College of Bankruptcy and was consistently named as one of America's leading insolvency and corporate restructuring attorneys by Chambers USA: America's Leading Business Lawyers since that publication's inception , and was recognized yearly as one of the nation's top restructuring and bankruptcy lawyers by America's Best Lawyers and America's Best Business Lawyers as well as other publications.

4. Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, my review of the Company's records, information provided by its employees and advisors, or my opinion based on my experience with the Company's operations and financial condition. If called upon to testify, I could and would testify competently to these matters on that basis.

**Background**

5. On or about October 17, 2026, I was contacted by Dennis Doyle, the Chief Executive Officer of Synexis, LLC ("**Synexis**" or the "**Company**"), concerning my appointment as an independent director and the potential formation of a restructuring committee.

6. Throughout my discussion with Mr. Doyle, it became immediately evident the Company was in need of a capital infusion, and on an extremely short time frame. Mr. Doyle informed me that the Noteholders[2] would be a natural source and quick source of financing for the Company as they (a) were already part of the Company's capital structure and (b) would be motivated to protect their investments. Mr. Doyle also informed me that many, but not all, of the Noteholders sat on the Company's board of directors. Given the complexity of the Company's operations and capital structure, coupled with its operating losses and the emergent cash situation, I believed finding true third-party funding that did not involve a priming lien or exorbitant fees was likely futile given the Company's prior efforts in this regard. I was informed that the Company sought various sources of funding prior to my engagement, but that none of those efforts yielded any success.

7. I understood that Mr. Bryan Marsal, a Board member, was possibly interested in providing the Company with the financing, but that he would only be willing to do so if the financing would be collateralized via a bankruptcy court order with DIP Financing senior priorities protections in the event of an alternative sale. As a condition to any funding and the provision of a proposed stalking horse bid, Mr. Marsal required a priming lien with priority ahead of all existing Noteholders, of which Mr. Marsal is one.

8. On October 26, 2026, the Board of Directors convened for several hours and, by unanimous vote of the directors voting, approved my engagement, formed a Restructuring Committee (the "**Committee**"), and designated me as its sole member and Chair. The Board

[2] The Debtor's prepetition secured indebtedness arises under that certain Senior Secured Note Purchase Agreement, dated as of March 1, 2026 (the "**Note Purchase Agreement**"), between Synexis, LLC and the purchasers party thereto (the "**Noteholders**"), pursuant to which the Debtor issued senior secured promissory notes (the "**Notes**") bearing interest at 14% per annum.

delegated to the Committee broad authority to negotiate and approve financing, the use of cash collateral, sales of assets, insider transactions, and the conduct of a Chapter 11 case, without further Board approval. The Board also authorized a Chapter 11 filing subject to specified conditions, including Committee approval of DIP financing and the filing date. All approvals required for my appointment as an independent director were obtained. The Third Amendment to the Company's Operating Agreement became effective October 31, 2026.

9. Negotiations with Noteholders continued over approximately ten days. I was informed by Mr. Doyle and others that certain holders expressed interest in providing $3 million to $4 million of DIP financing on or about October 16, 2026. Proposed terms were circulated to all Noteholders on November 7, 2026, with an opportunity for each to participate pro rata on equal terms. A minority group of Noteholders would not agree to DIP financing with liens priming the Notes unless all outstanding Notes were rolled up into DIP liens, irrespective of whether the Noteholder participated in funding the DIP. Those Noteholders also demanded the right to credit bid their prepetition Notes pro rata, regardless of participation in the financing. The November 7th proposal yielded no response indicating interest or disinterest, and the Noteholders did not reach agreement on financing terms. Some of the Noteholders requested more information regarding the Company's need for additional financing which we endeavored to provide to them.

10. By November 10, 2026, I was informed that Mr. Marsal no longer wished to fund DIP financing in partnership with other stakeholders. With the Noteholders unable to agree and the Company's liquidity nearly exhausted, I directed negotiations toward a standalone DIP commitment from Mr. Marsal coupled with a proposed stalking-horse purchase. Mr. Marsal was the only party offering financing on terms favorable to the Company.

11. The Company's cash was largely exhausted after its November 13, 2026 payroll run. It lacks sufficient funds for its approximately $313,000 November 25, 2026 payroll. As negotiations continued, Mr. Marsal offered to acquire substantially all of the Company's assets for $4 million through a stalking-horse bid, subject to higher and better offers. He agreed to advance up to $1.5 million of that purchase price as DIP financing to fund operations pending a sale. Mr. Marsal would not have offered that financing absent the proposed sale. This path provides emergency operating capital and a $4 million bidding floor against which other parties may bid. No competing purchase bid or alternative financing proposal on acceptable terms has been received.

12. Since the October 26, 2026 Board meeting, I have spearheaded the DIP financing negotiations directly and through Pack Law acting at my direction. The Board authorized me, as the Committee's sole member and Chair, to negotiate and approve financing and related sale arrangements on the Company's behalf. Mr. Marsal is both a director and a Noteholder. Under the conflict procedures reflected in the Board resolutions and my written process confirmation, Mr. Marsal was recused from Board and Committee deliberations and decisions concerning the transaction, Peter Sacripanti was recused from sale matters, and the Chief Executive Officer was recused from DIP matters.

**<u>Financing Alternatives and the Restructuring Committee's Negotiations</u>**

13. The Committee, which I chair as its sole member, conducted the financing process and engaged extensively with the Noteholders. To assess the market, the Company reviewed 40 debtor-in-possession financings of less than $10 million filed in Chapter 11 cases from May through October 2026. For the closest comparable facilities, the median all-in interest rate was approximately 10%, and total fees, where reported, were approximately 3.5%. I considered those comparisons in evaluating Mr. Marsal's proposed 3% interest rate with no lender fees and no roll

up of his prepetition Senior Secured Note, as compared with the 14% rate on the Company's Senior Secured Notes.

14. Based on information provided to me by the Company, it previously explored, among other alternatives, advances against its Employee Retention Credit receivables with Valiant Capital and SFG Capital, potential asset-based financing with Alpine Ridge Funding, and inventory sales to Hilco and GA Group, while BGL marketed the business. Those efforts did not produce any offers on acceptable terms. One asset-based lender could not close within 60 days, the inventory efforts produced no acceptable fixed-price bid, and BGL's sale process would not produce bids before the Company's cash ran out.

**Proposed DIP Facility**

15. The Committee then negotiated the proposed facility with Bryan Marsal or his designee. I negotiated with Mr. Marsal directly and through Pack Law at my direction. Pack Law sent him the proposed economic terms on November 12, 2026, and he accepted them in writing that day. The parties agreed upon the DIP term sheet and executed an escrow agreement with The Fiduciary Valet Corp. On November 16, 2026, I signed my written confirmation that the financing process was commercially sound and, as the sole Committee member, approved the DIP financing and selected November 18, 2026, as the filing date, subject to the escrow-funding condition. I also signed my written recommendation that the Company commence Chapter 11. The three documents were transmitted to the Board on November 17, 2026.

16. Mr. Marsal conditioned his financing on the proposed lien priorities, superpriority claim, and senior priority repayment protections in the event of an alternative sale. He would not advance the funds without those protections. In light of the unsuccessful third-party financing efforts and Noteholder negotiations, no other source offered financing acceptable to the Company,

including financing on less demanding terms. Based on that process, I determined that the Company needed the protections negotiated with Mr. Marsal to obtain the required financing.

17. In my judgment, entry into the proposed DIP Facility is a sound business decision. The facility provides up to $1,500,000 of DIP financing at 3% annual interest, with no lender fees, points, or commitment fees. The $1,500,000 has been deposited with The Fiduciary Valet Corp. under the signed escrow agreement and will be released to the Company on its certificate after entry of the interim DIP order. The financing will fund operations and support a competitive sale process.

18. I evaluated the negotiated lien priorities, the DIP Lender's right to credit bid outstanding DIP Obligations, the proposed sale milestones, and the contemplated stalking-horse protections as parts of the overall transaction. The DIP Lender will be repaid first from proceeds of an alternative sale. I concluded that the proposed terms were reasonable in light of the immediate liquidity needed to preserve operations and the opportunity for higher and better purchase offers.

19. Accordingly, I believe entry into the DIP Facility is in the best interests of the Company and its creditors, is necessary to preserve the value of the estate assets, and reflects sound and reasonable business judgment.

20. The Company seeks superpriority administrative expense status under section 364(c)(1), first-priority liens on otherwise unencumbered estate assets under section 364(c)(2), and priming liens on encumbered collateral under section 364(d)(1). Mr. Marsal required these priorities and senior priority repayment rights as conditions to funding. No other source offered financing on terms acceptable to the Company, including on a less senior basis. The Board also authorized the Company to seek use of cash collateral and to provide adequate protection, in each case subject to Bankruptcy Court approval.

21. The Company needs immediate access to the proposed $1,500,000 DIP advance to fund payroll and operating expenses while pursuing a sale. Cash is largely exhausted, and the Company cannot fund the approximately $313,000 scheduled for withdrawal on November 25, 2026, for payroll. Without prompt access to the escrowed funds following an interim order, the Company cannot maintain operations or preserve the opportunity for a competitive sale. In my judgment, the negotiated priorities are necessary to secure that financing.

22. The financing was negotiated in good faith by the Committee with Mr. Marsal, directly and through counsel acting at my direction. I evaluated the terms against the Company's available alternatives, market comparisons, and immediate liquidity needs, and independently approved the transaction. Based on that process, I believe the financing was extended in good faith and warrants the protections of section 364(e) for credit actually extended.

23. The proposed DIP Liens and DIP Superpriority Claims will be subject to the Carve Out provided in the DIP financing documents. The Carve Out covers professional fees, fees owed to the Clerk of the Bankruptcy Court, and amounts payable to the Subchapter V Trustee. It provides for the professional and fiduciary services necessary to administer this case and complete the transaction process.

24. The proposed milestones call for a bidding-procedures motion by November 27, 2026, entry of a bidding-procedures order by December 4, 2026, a Qualified Bid Deadline of December 11, 2026, and an auction on December 14, 2026. The sale is targeted to close on or before December 18, 2026. Failure to meet an agreed sale milestone shall be an event of default, subject to written extension or waiver. These deadlines are intended to advance a competitive sale process while limiting continued cash consumption.

25. Mr. Marsal or his designee will serve as the stalking-horse bidder for a purchase of substantially all the Company's assets for $4,000,000, subject to higher and better offers under court-approved bidding procedures. The offer establishes a floor against which other parties may bid. No competing bid has been received.

26. The DIP Lender or its designee will be entitled to credit bid outstanding DIP Obligations secured by the DIP Collateral under section 363(k). Any credit bid will be applied against those obligations upon closing. The stalking-horse purchase price shall be the aggregate amount of $4,000,000, regardless of the amount of outstanding DIP Obligations.

27. The contemplated stalking-horse protections include reimbursement of actual, reasonable, documented transaction expenses capped at $100,000, a breakup fee equal to 3% of the $4,000,000 Stalking-Horse Bid Amount, and a minimum initial overbid equal to the Stalking Horse Bid Amount of $4,000,000.00 plus the breakup fee and expense reimbursement plus $100,000. The Company will seek approval of those protections and detailed auction procedures through a bidding-procedures motion under Local Rule 6004-1.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 18, 2026

*/s/ Claudia Z. Springer*
Claudia Z. Springer
Independent Restructuring Director and Chair,
Restructuring Committee